UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                          :

GENERATION NEXT FASHIONS LTD.,           :

                     Plaintiff,        :

                                            :                21-cv-9266 (LJL)

      -v-                              :

                                            :       OPINION AND ORDER

JP MORGAN CHASE BANK, NA., and        :
SPORTLIFE BRANDS LLC,                :

                                            :

                   Defendants.     :

                                            :
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Generation Next Fashions Ltd. ("Generation Next" or "Plaintiff") brings claims against defendant JP Morgan Chase Bank, N.A. ("JPMorgan" or "Moving Defendant") for breach of contract, breach of fiduciary duty, conversion, negligence, tortious interference with contract, bailment, fraud, and civil conspiracy. Dkt. No. 74. JPMorgan moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the claims as against it for failure to state a claim for relief. Dkt. Nos. 39, 77.[1]

      For the following reasons, the Court grants JPMorgan's motion to dismiss all of Plaintiff's claims as against it.

---

[1] Plaintiff filed its initial complaint on November 9, 2021, Dkt. No. 1, and an amended complaint on March 21, 2022, Dkt. No. 31. Defendant filed a motion to dismiss the amended complaint on May 5, 2022 (the "Motion to Dismiss"). Dkt. No. 39. On March 3, 2023, Plaintiff filed a second amended complaint (the "Second Amended Complaint" or "SAC"). Dkt. No. 74. The Court thus denied Defendant's Motion to Dismiss as moot, and issued an order directing JPMorgan to indicate whether the Court should consider its Motion to Dismiss as one against the Second Amended Complaint, or if JPMorgan intended to file a new Motion to Dismiss. Dkt. No. 76. JPMorgan responded that it intended to rest on the arguments contained in its previous Motion to Dismiss, and did not intend to file a new motion. Dkt. No. 77. The Court therefore considers the Motion to Dismiss as against the Second Amended Complaint.

## BACKGROUND

The following facts are taken from the Second Amended Complaint and the documents attached thereto, and are taken as true for the purposes of the motion to dismiss.

Plaintiff's claims arise out of the sale of garments by Generation Next to defendant SportLife Brands LLC ("SportLife").  Dkt. No. 74.  Generation Next is a Bangladeshi public corporation with its principal place of business in Dhaka, Bangladesh.  *Id.* ¶ 1.  SportLife is a Delaware limited liability company with its principal office located in New York, New York.  *Id.* ¶ 3.  On March 21, 2020, Generation Next received emailed orders from Specsavers, a disclosed agent of SportLife working as its brokerage house in Bangladesh.  *Id.* ¶ 12.  The emailed orders, placed by Specsavers on behalf of SportLife, were for the purchase of almost 300,00 items of readymade garments ("RMG") from Generation Next.  *Id*.  Specifically, Specsavers provided Generation Next with two sales contracts that it had drafted (the "Sales Contracts"): (1) contract number SLB/SPECS/SP20/LOUNGT/20-01, dated July 17, 2020 for the purchase of 128,448 RMGs in the amount of $276,589.44; and (2) contract number SLB/SPECS/SP20/BASEA Layer & LOUSE/20-02, dated July 20, 2020, for 153,798 pieces of RMG, for $391,075.98.  *Id.* ¶ 13.  The total for the two contracts together was $667,665.42.  *Id.*

The RMG goods were inspected by Specsavers at the shipping terminal in Dhaka, Bangladesh, were accepted without reservation, and were handed over to the freight forwarder nominated by SportLife for shipment in August 2020.  *Id.* ¶ 20–21.  One shipment then occurred on August 14, 2020, three other shipments occurred on August 18, 2020, a fifth shipment was made on August 25, 2020, and the final three shipments were made on August 31, 2020 pursuant to the terms of the Sales Contracts.  *Id.* ¶ 21–22.

To arrange for payment for the goods, the parties chose to use a means of collection called documentary collection which is an alternative to letters of credit.  *Id.* ¶¶ 22–24.  In a bank

collection of documents transaction or a documentary collection transaction, banks serve as intermediaries for buyers and sellers of goods but without themselves making any engagement or promise to pay the seller against receipt of the commercial documents related to the transaction. Thereby, the bank takes no credit risk.  *See* James E. Byrne, LC Rules & Laws Critical Texts for Independent Undertakings 55 (6th ed. 2016); *see also* 1 Alan S. Gutterman, Corporate Counsel's Guide to Strategic Alliances § 4:23 (Dec. 2022) (hereinafter Guide to Strategic Alliances); *see Monarch Gems v. Malca-Amit USA*, 2007 WL 2892636, at *9 (N.D. Ill. Sept. 27, 2007) ("[B]anks involved in a documentary collection do not guarantee payment or assume credit risks."); *Texful Textile Ltd. v. Cotton Exp. Textile, Inc.*, 891 F. Supp. 1381, 1388 (C.D. Cal. 1995) ("Even a brief review of the nature of documentary collections shows that by definition, banks operate solely as conduits in these transactions.").  "In cash against document collection transactions, each party appoints a bank to act on its behalf; the exporter appoints a remitting bank while the importer appoints a collecting bank."  *Select Harvest USA LLC v. Indian Overseas Bank*, 2023 WL 2664079, at *1 (S.D.N.Y. Mar. 28, 2023) (internal quotation marks omitted).  "The exporter sends goods to a location designated by contract."  *See* 1 Alan S. Gutterman & Robert L. Brown, Going Global: A Guide to Building an International Business § 11:6 (2022 ed.).  The seller also presents the required documents (including bills of lading, invoices, and certificates of origin) to the remitting bank, who forwards the documents to the collecting bank.

The Uniform Rules for Collection is a set of rules promulgated by the International Chamber of Commerce that specifies certain duties for parties to a documentary collection. Uniform Rules for Collection, International Chamber of Commerce Publication No. 522 ("URC 522"), Preface.  URC 522 is not independently binding international law; it only applies if its

rules are incorporated into the collection instructions.  URC 522, Art. 1; *see also Inox Wares Pvt. Ltd. v. Interchange Bank*, 2008 WL 4691906, at *4 (D.N.J. Oct. 22, 2008) (stating that a collecting bank becomes bound by URC 522 if it agrees to handle a collection that incorporates URC 522.  URC 522 places the burden on the collecting bank to reject obligations imposed by the transmittal of collecting instructions.  *See* URC 522, Art. 1(c) ("If a bank elects, for any reason, not to handle a collection or any related instructions received by it, it must advise the party from whom it received the collection or the instructions by telecommunication or, if that is not possible, by other expeditious means, without delay.").  If URC 522 applies, then each bank is bound to "act in good faith and exercise reasonable care." *Id.* at Art. 9.  Under Article 4(a)(i), "[a]ll documents sent for collection must be accompanied by a collection instruction indicating that that collection is subject to URC 522 and giving complete and precise instructions.  Banks are only permitted to acts upon the instructions given in such collection instruction, and in accordance with these Rules."  URC 522, Art. 4(a)(1).

In the case of the RMG sold by Generation Next to SportLife, JPMorgan acted as "collecting bank" for the importer, SportLife.  Dkt. No. 74 ¶ 15.  Generation Next's bank, Southeast Bank Limited ("SEBL"), acted as the remitting bank.  *Id.* ¶ 44.  Generation Next, through SEBL, sent all documents to JPMorgan.  *Id.* ¶ 23.  The terms of the Sales Contracts provided for title to be passed on Freight on Board ("FOB")[2] terms with 60 days deferred payment.  *Id.* ¶ 14.  The collection instructions for each of the shipments (the "Collection Instructions") identified Plaintiff as the "drawer," SportLife as the drawee, the tenor as "60 days

---

[2] FOB, also known as "free on board," is "a mercantile-contract term allocating the rights and duties of the buyer and the seller of goods with respect to delivery, payment, and risk of loss, whereby the seller must clear the goods for export, and the buyer must arrange for transportation. The seller's delivery is complete (and the risk of loss passes to the buyer) when the goods pass into the transporter's possession." *Free on Board*, Black's Law Dictionary (11th ed. 2019).

sight"—meaning 60 days payment terms.  *See* Dkt. Nos. 41-1–41-7.[3]  The Collection

Instructions also stated, "[t]his drawing is subject to the Uniform Rules for Collection ICC

Publication No. 522" thereby incorporating URC 522 by reference.  *Id.*  The Collection

Instructions contained the following directives for JPMorgan:  (1) "Please Advise Non

Payment/Acceptance with reason by SWIFT"; (2) "All charges outside Bangladesh are on

account of Applicant/Drawee"; (3) "**Please Deliver Documents against Acceptance**"; and (4)

instructions regarding where the proceeds should be remitted.  *Id.*  (emphasis in original).

"Acceptance" is a term of art in international commerce and conveys the importer's agreement to

pay according to the terms of a sales contract.  Delivery against acceptance is to be distinguished

from delivery against payment, which requires the collecting bank to have received from the

importer the funds to be delivered to the remitting bank before documents are delivered.

On two dates in September and a third date in November, JPMorgan obtained acceptance

from SportLife with the maturity dates for payment and it therefore released the shipping title

and commercial documents to SportLife.  Dkt. No. 74 ¶¶ 23, 26.  Thus, "[p]ursuant to the

agreements, goods delivered to the port in Bangladesh were released upon acceptance given by

the collecting bank, [JPMorgan], with 60 days deferred payment; and upon maturity of the

acceptance, payment was to be made by drawee, *i.e.*, SportLife."  *Id.* ¶ 15.

---

[3] Although Plaintiff omitted the Collection Instructions from the SAC, the Court is permitted to
consider the collection instructions in deciding JPMorgan's motion to dismiss under Federal
Rule of Civil Procedure 12(b)(6).  *See Glob. Network Commc'ns v. City of N.Y.*, 458 F.3d 150,
157 (2d Cir. 2006) (holding that courts may consider extrinsic documents when deciding a
motion to dismiss where "the incorporated material is a contract or other legal document
containing obligations upon which the plaintiff's complaint stands or falls, but which for some
reason—usually because the document, read in its entirety would undermine the legitimacy of the
plaintiff's claim—was not attached to the complaint"); *see also Broder v. Cablevision Sys.
Corp.*, 418 F.3d 187, 196–97 (2d Cir. 2005).  The content of the Collection Instructions, which
outline JPMorgan's obligations with respect to the title documents, are integral to the claims
alleged in the SAC.

Trouble began, however, when SportLife failed to pay for the goods.  Following the 60-day deferred payment period, Generation Next did not receive payment from SportLife.  *Id.* ¶ 18.  Generation Next's bank in Bangladesh, SEBL, made payment demands on October 21, 2020, November 11, 2020[4] and November 24, 2020.  *Id.* ¶¶ 27–28.  JPMorgan did not immediately respond to the payment demands.  *Id.*  In emails dated November 10, 2020 and November 11, 2020, Specsavers acknowledged that SportLife was sorry for the delay in payment and would make full payment shortly.  *Id.* ¶ 35.  On December 1, 2020, JP Morgan sent SWIFT messages to Generation Next and asked it to contact SportLife for payment.  *Id.* ¶ 31.  Thereafter, in emails dated December 23, 2020 and December 28, 2020, Specsavers—on behalf of SportLife—"sought a sudden and unlawful discount" of eight percent.  *Id.* ¶¶ 34–35.  By email dated December 29, 2020, Plaintiff agreed to the "unlawful demand" and to the discount sought.  *Id.* ¶ 36.

However, on January 17, 2021,[5] JPMorgan sent a SWIFT message with a purported second maturity date of January 25, 2021, referencing what was represented to be an "enclosed signed agreement between SportLife and Specsavers, the agent of Generation Next."  *Id.* ¶ 37.  Plaintiff alleges that JPMorgan's SWIFT message was knowingly false:  Specsavers was not Plaintiff's agent but the agent of SportLife, and no written agreement was signed by Generation Next giving a further discount to SportLife.  *Id.* ¶ 38.  No payment was made on January 20, 2021; JPMorgan "did nothing" before January 20, 2021 to protect Plaintiff's interests in

---

[4] The SAC at paragraph 28 refers to a date of February 11, 2020.  Dkt. No. 74 ¶ 28.  That is an obvious typographical error.  SportLife had not even placed its orders until March 2020.  From context, it appears that Plaintiff intended to plead a date of November 11, 2020.

[5] The SAC at paragraph 37 refers to a date of January 17, 2020.  Dkt. No. 74 ¶ 37.  That is an obvious typographical error.  SportLife had not even placed its orders until March 2020.  From context, it appears that Plaintiff intended to plead a date of January 17, 2021.

receiving payment and "took no substantial and/or reasonable actions thereafter to seek to collect payment from SportLife." *Id.* ¶ 42.

In March 2021, SportLife offered to provide a new schedule of payment, which Generation Next outright denied. *Id.* ¶ 43.  Plaintiff's remitting bank, SEBL, sent a fourth payment demand to JPMorgan on March 24, 2021 but Plaintiff still was not paid. *Id.* ¶ 44.  On June 20, 2021, SEBL again sent a further payment demand to JPMorgan. *Id.* ¶ 45.  The next day, JPMorgan replied that a new payment schedule was being reviewed according to an agreement that it represented was enclosed, but no agreement was in fact enclosed. *Id.*  On August 3, 2021, Generation Next, through SEBL, sought a copy of the alleged agreement to which JPMorgan had twice referred but never provided. *Id.* ¶ 47.  Rather than providing the agreement, JPMorgan sent new purported maturity dates which contained discounts for SportLife. *Id.* ¶ 49.  By SWIFT message of September 28, 2021, Plaintiff denied the new maturity dates and sought payment. *Id.* ¶ 50.  JPMorgan did not respond. *Id.*

## PROCEDURAL HISTORY

On November 9, 2021, Plaintiff filed the complaint.  Dkt. No. 1.  On March 19, 2022, the Court granted Plaintiff's motion for leave to file an amended complaint on consent and without prejudice to the right of JPMorgan to move to dismiss.  Dkt. Nos. 26, 29.  On March 21, 2022, Plaintiff filed the first amended complaint.  Dkt. No. 31.

On May 5, 2022, JPMorgan filed this motion to dismiss, along with a memorandum of law in support of the motion and two declarations.  Dkt. Nos. 39–42.  On August 12, 2022, Plaintiff filed a memorandum of law in opposition to the motion to dismiss.  Dkt. No. 53.  On September 23, 2022, JPMorgan filed a reply memorandum of law in further support of the motion to dismiss along with an additional declaration.  Dkt. Nos. 54–55.  On March 3, 2023, Plaintiff filed the Second Amended Complaint.  Dkt. No. 74.  The SAC addressed deficiencies in

Plaintiff's jurisdictional allegations that the Court identified by order dated January 22, 2023.

Dkt. No. 61.  The SAC alleges claims against JPMorgan for breach of contract, breach of

fiduciary duty, conversion, negligence, tortious interference with contract, bailment, and

"tortious interference based on fraudulent contract."  Dkt. No. 74 ¶¶ 51–81, 95–101.  It also

alleges claims against SportLife for breach of contract and conversion.  *Id.* ¶¶ 82–89.  It alleges a

claim for tortious interference against SportLife and the individual officers of SportLife.  *Id.* ¶¶

90–94.  Finally, it alleges claims for fraud and civil conspiracy against all defendants.  *Id.* ¶¶

102–109.

The Court denied the motion to dismiss the amended complaint as moot on March 6,

2023.  Dkt. No. 75.  The Court also ordered JPMorgan to inform the Court whether it intended to

rely on the arguments made in its previously filed motion to dismiss in moving to dismiss the

Second Amended Complaint or instead to answer or file a new motion to dismiss.  Dkt. No. 76.

By letter of March 8, 2023, JPMorgan informed the Court that it intended to rely on the

arguments made in its previously-filed motion to dismiss the amended complaint.  Dkt. No. 77.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for

failure to state a claim upon which relief can be granted, a complaint must include "sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 570 (2007)).  A complaint must offer more than "labels and conclusions," "a formulaic

recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual

enhancement."  *Twombly*, 550 U.S. at 555, 557.  The ultimate question is whether "[a] claim has

facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at

678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

## DISCUSSION

JPMorgan moves to dismiss all of the claims against it.  Dkt. No. 39.  The thrust of its argument is that it was under no direct contractual relationship with Plaintiff, that to the extent it owed any duties to Plaintiff, those duties were defined by the Collection Instructions it received, that it discharged those duties, and that the SAC does not allege any acts that JPMorgan took that interfered with Plaintiff's ability to collect from SportLife.  JPMorgan claims that it "was obviously brought into this case either to wrongfully give Plaintiff a deep-pocket defendant in circumstances where the real party in interest, SportLife, may not be able to pay its debt, or in the hopes that JPMorgan would pressure SportLife to pay Plaintiff."  Dkt. No. 42 at 2.

The Court addresses each claim in turn.

## I.    Breach of Contract

JPMorgan first moves to dismiss Plaintiff's claim against it for breach of contract. "Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages."  *Lamda Sols. Corp. v. HSBC Bank USA, N.A.*, 2021 WL 5772290, at *4 (S.D.N.Y. Dec. 6, 2021) (quoting *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011)).  "[A] breach of contract claim will be dismissed where a plaintiff fails to allege 'the essential terms of the parties' purported contract, including the specific provisions of the contract upon which liability is predicated."  *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 644–45 (S.D.N.Y. 2011)

(quoting *Martinez v. Vakko Holding A.S.*, 2008 WL 2876529, at *2 (S.D.N.Y. July 23, 2008));

*see also Diesenhouse v. Soc. Learning & Payments, Inc.*, 2022 WL 3100562, at *3 (S.D.N.Y.

Aug. 3, 2022); *Nuevos Aires Shows LLC v. Buhler*, 2020 WL 1903995, at *4 (S.D.N.Y. Apr. 17,

2020).

Plaintiff claims that a contractual relationship was created between it and JPMorgan "as

per URC 522 and [the New York Uniform Commercial Code,] the UCC [("N.Y. UCC")]."  Dkt.

No. 53 at 15.  It further claims that such contractual relationship obligated JPMorgan first to

"collect payment," and second to "endeavor to ascertain the reason for non-payment, and without

delay to advise about the non-payment."  Dkt. No. 74 ¶ 52.  The language in the SAC identifying

the second obligation that JPMorgan allegedly breached comes from URC 522 Article 26, which

states:

> The presenting bank should endeavour to ascertain the reasons for non-payment
> and/or non-acceptance and advise accordingly, without delay, the bank from which
> it received the collection instruction.
>
> The presenting bank must send without delay advice of nonpayment and/or advice
> of non-acceptance to the bank from which it received the collection instruction.

URC 522, Art. 26(c)(3).  Plaintiff alleges that JPMorgan failed to perform both obligations,

thereby giving rise to a claim for breach of contract.  Dkt. No. 74 ¶ 52.

JPMorgan responds that Plaintiff's breach of contract claim should be dismissed because

the SAC fails to identify a contract that Plaintiff enjoyed with JPMorgan, and alternatively that—

even assuming that the Collection Instructions did form a contract—JPMorgan discharged all of

its duties pursuant to the Collection Instructions.  Dkt. No. 42 at 6–12.  Further, JPMorgan

argues that—even if it did have an obligation to ascertain the reason for non-payment, and to

advise about non-payment—Plaintiff has not alleged facts showing that JPMorgan failed to

fulfill such obligation, and that any alleged failure to fulfill such obligation could not have

caused Plaintiff harm.  *Id.* at 18–20.

JPMorgan's initial argument that Plaintiff has failed to plead the existence of a contract is without merit.  Plaintiff has alleged all of the elements necessary to establish that the Collection Instructions it received pursuant to URC 522 constitute a binding contract; SEBL, on behalf of Generation Next, sent the Collection Instructions and the documents to JPMorgan and JPMorgan—which had the right to reject the Instructions, *see* URC 522, Art. 1(b)—instead accepted those documents and thereby assumed the obligations set forth in the Instructions.  As a result, there was a meeting of the minds.  *See Specht v. Netscape Commc'ns Corp.*, 150 F. Supp. 2d 585, 587 (S.D.N.Y. 2001) ("Promises become binding when there is a meeting of the minds and consideration is exchanged."), *aff'd*, 306 F.3d 17 (2d Cir. 2002).[6]  Importantly, "URC No. 522 has no binding effect until a collecting bank accepts a document for collection which is accompanied by a collection instruction which incorporates No. 522.  The operative legal mechanism is contractual: the URCs become binding when two parties enter into a contract which incorporates them."  *Inox Wares Pvt. Ltd.*, 2008 WL 4691906, at *4.  Once JPMorgan accepted the Collection Instructions, it was obligated to "'act in good faith and exercise reasonable care'" to carry them out.  *Select Harvest USA LLC*, 2023 WL 2664079, at *2 (quoting URC 522, Art. 9).

Where Plaintiff's claim fails, however, is in its allegations that JPMorgan breached a contract with it.  Plaintiff first alleges that "[b]y virtue of being the presenting and collecting Bank, JPM was responsible for collection of all invoices due and owing from SportLife, and for remitting such sums owed to Generation Next via its banking agent in Bangladesh."  Dkt. No. 74

---

[6] JPMorgan does not dispute that there was consideration for its assumption of the obligations set forth in the Collection Instructions.

¶ 24; *see also id.* ¶ 52 (alleging that JPMorgan was obligated "to collect payment").  Those

allegations are not supported by the SAC or the documents incorporated by reference therein.  As

the collecting bank, JPMorgan was "only permitted to act upon the instructions given in such

collection instruction, and in accordance with [URC No. 522]."  URC 522, Art. 4(a)(1).  The

Collection Instructions directed JPMorgan to deliver the documents upon acceptance by

SportLife, not upon payment.  Dkt. Nos. 41-1–41-5.  Accordingly, once SportLife accepted the

RMG and assumed the obligation to pay, JPMorgan was required to deliver the documents.  It

had no obligation to collect.[7]

Plaintiff further alleges that JPMorgan was obligated, "pursuant to Article 26 of URC

§ 522[,] to advise non-payment without delay, and to seek appropriate instruction from the

remitting bank."  Dkt. No. 74 ¶ 32.  The Court does not, however, read URC Article 26 as

imposing such obligation on JPMorgan in the instant case.  URC Article 26(c) imposes on the

collecting bank an obligation to—at the time the purchaser determines whether to consummate

the transaction in the form of either payment or notice of acceptance as provided for in the

Collection Instructions—advise the remitting bank if the purchaser accepts or rejects the goods

(for example, if the purchaser believes the goods to be non-conforming).  Article 26(c) is divided

into three subsections: the first titled "Advice of Payment"; the second titled "Advice of

Acceptance"; and the third titled "Advice of Non-Payment and/or Non-Acceptance."  URC 522,

---

[7] Plaintiff also invokes N.Y. UCC § 4-503.  Under the N.Y. UCC as well, however, the collecting bank is not obligated to pay an accepted draft drawn on a third party.  *See Fashion Shop LLC v. Virtual Sales Grp. Corp.*, 525 F. Supp. 2d 436, 443–44 (S.D.N.Y. 2007); *Wasan Shoes v. Baker*, 759 N.Y.S.2d 5 (1st Dept. 2003).  Under Article 4, Section 503 of the N.Y. UCC, "[u]nless otherwise instructed and except as provided in Article 5 a bank presenting a documentary draft (a) *must* deliver the documents to the drawee on acceptance of the draft if it is payable more than three days after presentment; otherwise, only on payment."  N.Y. UCC § 4-503.  Based on the allegations of the SAC, JPMorgan discharged those responsibilities.

Art. 26.  In that context, Article 26(c) can be read as providing instructions to the remitting bank in the event of three possible scenarios: first in the scenario that the collection instructions call for delivery against payment and purchaser pays, second in the scenario that the collection instructions call for delivery against acceptance and the purchaser accepts, and third in the scenario that the purchaser does not consummate the transaction by refusing to pay or accept. Such reading of Article 26(c) is bolstered by the full text of Article 26(c)(iii), which Plaintiff alleges JPMorgan breached, and which states that:

> On receipt of such advice [of non-payment and/or non-acceptance] the remitting bank must give appropriate instruction as to the further handling of the documents. If such instructions are not received by the presenting bank within 60 days after its advice of non-payment and/or non-acceptance, the documents may be returned to the bank from which the collection instruction was received without any further responsibility on the part of the presenting bank.

URC 522, Art. 26(c)(3).  Article 26(c)(3) therefore contemplates a scenario where the collecting bank still possesses the title documents and has not yet transferred them to the purchaser.  If the instructions call for delivery against payment and the purchaser has refused to pay, the collecting bank should attempt to "ascertain the reasons for non-payment."  URC 522, Art. 26(c)(3).  If the instructions call for delivery against acceptance and the purchaser refuses to accept, then the collecting bank should attempt to understand the reasons for non-acceptance. *Id.*  If, however, the purchaser has agreed to pay and/or accept, as the case may be, the collecting bank has no further obligation of inquiry with respect to the purchaser.  The collecting bank's job is done.  In particular, where the collecting instructions call for delivery against acceptance and the purchaser has accepted, the collecting bank's duty is to deliver the documents.  It has no continuing and further duty to monitor whether the purchaser has paid and, if it has not, to understand the reasons for non-payment.

In this case, because SportLife accepted the goods at the port in Bangladesh, JPMorgan

had an obligation under Article 26(c)(ii) to advise the remitting bank, SEBL, of SportLife's acceptance of the goods.[8]  Dkt. No. 74.  But because SportLife had already accepted the goods and JPMorgan had already validly transferred the title documents in accordance with the Collection Instructions, JPMorgan did not have an obligation to "endeavour to ascertain the reasons for non-payment and/or non-acceptance and advise accordingly, without delay, the bank from which it received the collection instruction" or to "send without delay advice of non-payment and/or advice or non-acceptance to the bank from which it received the collection instruction" under Article 26(c)(iii).  JPMorgan discharged its contractual responsibilities.

In its opposition, Plaintiff offers a new theory.  Dkt. No. 53 at 15–17.  It points to a SWIFT message it sent to JPMorgan authorizing it to amend the collection instructions to read "Drawn on Sportlife Brands LLC and take written undertaking from drawee to release the document in order to make payment on maturity (sixty days from the date of B/L)."  Dkt. No. 53-4.  It claims that JPMorgan therefore had a duty not just to obtain acceptance from SportLife but also to obtain an undertaking from SportLife to pay.  Dkt. No. 53 at 9.  JPMorgan responds that when SEBL sent JPMorgan Bills of Exchange, they were mistakenly drawn on JPMorgan and not on SportLife, who was the "drawee" in SEBL's Collection Instructions.  Dkt. No. 54 at 2. After JPMorgan told SEBL that, because of this error, it could not release the transaction papers to SportLife, SEBL authorized JPMorgan to amend the instructions to make SportLife the drawee and to "take written undertaking from drawee" before releasing the transaction documents.  *Id*.  JPMorgan claims that it did so by having SportLife sign each draft, thereby accepting each draft.  *Id.* at 2–3.

There are at least two flaws to Plaintiff's new theory.  First, it is a new theory.  Plaintiff

---

[8] Plaintiff does not bring a claim against JPMorgan for an alleged failure to fulfill that obligation.

did not allege that JPMorgan violated its collection instructions or a contract by failing to obtain

an undertaking; the SAC alleges that JPMorgan breached its contract with Plaintiff by failing to

collect payment, by failing to ascertain the reason for non-payment, and for failing to advise

about the non-payment.  Dkt. No. 74 ¶ 52.  It did not mention at all the instruction from SEBL to

obtain an undertaking.  Plaintiff's own allegations and the documents incorporated by reference

refute the notion that JPMorgan had a duty to collect.  It is too late, and improper, for Plaintiff

now, having been confronted with JPMorgan's arguments, to attempt to revive its complaint by

making new claims in a brief in opposition. *Mira v. Argus Media*, 2017 WL 1184302, at *3 n.4

(S.D.N.Y. Mar. 29, 2017) ("Although district courts sometimes consider new factual allegations

made in a *pro se* plaintiff's opposition briefs where they are consistent with those in the

complaint, *see Braxton v. Nichols,* No. 08-cv-8568, 2010 WL 1010001, at *1 (S.D.N.Y. Mar. 18,

2010), they do not consider entirely new claims, *see Pandozy v. Segan*, 518 F. Supp. 2d 550, 554

n.1 (S.D.N.Y. 2007), *aff'd*, 340 Fed.Appx. 723 (2d Cir. 2009); *Weerahandi v. Am. Statistical*

*Ass'n*, No. 14-cv-7688 (AT), 2015 WL 5821634, at *8 (S.D.N.Y. Sept. 30, 2015), nor do they

allow a plaintiff to use an opposition brief to effectively amend her complaint, *see Pandozy*, 518

F. Supp. 2d at 554 n.1 (collecting cases).").  The theory cannot save Plaintiff's contract claim for

that reason alone.

Second, even assuming that Plaintiff's new theory were properly cognizable

notwithstanding the failure to plead it, Plaintiff has not explained what it would mean for the

collecting bank to obtain from the drawee an undertaking to pay other than to do what Plaintiff

alleges JPMorgan did—obtain SportLife's acceptance of the transaction documents before it

released title to the goods and thereby secure SportLife's obligation to pay.  The thrust of

Plaintiff's SAC is that SportLife assumed an obligation to pay for the RMG and that it is

therefore in breach for having failed to do so.  *See* Dkt. No. 74 ¶¶ 13–15, 18, 20.  In particular,

Plaintiff affirmatively alleges that upon acceptance of the RMG, SportLife undertook to pay for

those goods and that such undertaking is enforceable in contract.  *Id.* ¶¶ 83–85.

The Court concludes that the allegations in Plaintiff's SAC fail to establish that

JPMorgan breached a contractual obligation that it had; therefore, Plaintiff's claim for breach of

contract against JPMorgan is dismissed for failure to state a claim upon which relief may be

granted.

## II.    Breach of Fiduciary Duty

JPMorgan next moves to dismiss Plaintiff's claim against it for breach of fiduciary duty.

A claim for "[b]reach of fiduciary duty requires (1) the existence of a fiduciary duty owed by the

defendant; (2) a breach of that duty; and (3) resulting damages."  *Jones v. Voskresenskaya*, 5

N.Y.S.3d 16, 17 (1st Dep't 2015).  "Under New York law, a breach of contract will not give rise

to a tort claim unless a legal duty independent of the contract itself has been violated."

*Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir.

2012) (citing *Clark-Fitzpatrick v. Long Island R.R. Co.*, 516 N.E.2d 190 (N.Y. 1987)); *see also*

Restatement (Third) of Torts: Liab. for Econ. Harm § 4 (Am. L. Inst. 2020) ("The background

rule . . . serves to prevent tort obligations from interfering with the allocation of risks the parties

made in their contract, and to encourage parties to specify their obligations rather than leaving

them for a court to discern later.").  The independent legal duty giving rise to a tort claim "must

spring from circumstances extraneous to, and not constituting elements of, the contract, although

it may be connected with and dependent upon the contract."  *Clark-Fitzpatrick*, 516 N.E.2d at

194.  "Where an independent tort duty is present, a plaintiff may maintain both tort and contract

claims arising out of the same allegedly wrongful conduct."  *Bayerische Landesbank*, 692 F.3d at

58 (citing *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 898–99 (2d Cir. 1980)).  "If, however,

the basis of a party's claim is a breach of solely contractual obligations, such that the plaintiff is merely seeking to obtain the benefit of the contractual bargain through an action in tort, the claim is precluded as duplicative." *Id.* (citing *New York Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 770 (N.Y. 1995)); *see also Hargrave*, 636 F.2d at 899 ("If the only interest at stake is that of holding the defendant to a promise, the courts have said that the plaintiff may not transmogrify the contract claim into one for tort.").

Plaintiff alleges that JPMorgan undertook a fiduciary duty by acting as a collecting agent for Generation Next.  Dkt. No. 74 ¶ 55.  Plaintiff alleges that pursuant to that duty, JPMorgan was obligated "to collect payment" and "to endeavor to ascertain the reason for non-payment . . . without delay."  *Id.* ¶ 57.  Plaintiff alleges that JPMorgan failed to do so, thereby breaching a fiduciary duty that it owed to Plaintiff.  *Id.* ¶¶ 59–60.  JPMorgan replies that Plaintiff's claim for breach of fiduciary duty fails because Plaintiff has failed to allege facts to establish it owed a fiduciary duty to Plaintiff.  Dkt. No. 42 at 15–16.

Plaintiff fails to allege facts which establish the existence of a fiduciary duty independent of the contractual agreement that bound the parties.  "[I]t is well settled that a collecting bank . . . does not have a fiduciary relationship with its accountholders."  *Law Offices of Oliver Zhou v. Citibank N.A.*, 2017 WL 979062, at *5 (S.D.N.Y. Mar. 13, 2017) (citing N.Y. UCC § 4-201(1)); *see also Greenberg, Trager & Herbst, LLP v. HSBC Bank USA*, 958 N.E.2d 77, 84 (N.Y. 2011) ("[T]he term 'agent' means that the item and any inherent risk in that item remains with the depositor and not the collecting bank."); *Hanna v. First Nat'l Bank of Rochester*, 661 N.E.2d 683, 689 (N.Y. 1995) ("A collecting bank acts as the agent of its customer, and until such time as the collecting bank receives final payment, the risk of loss continues in the customer, the owner of the item."); *JPMorgan Chase Bank, N.A. v. Freyberg*, 171 F. Supp. 3d 178, 184 (S.D.N.Y.

2016) (same)).  JPMorgan and Plaintiff were dealing at arm-length, the only act JPMorgan took

to assume obligations to Plaintiff was to accept the Collection Instructions, and the Collection

Instructions were purely contractual and did not impose on JPMorgan any fiduciary duties.

Because the relationship between the parties was governed by a contract which did not impose a

fiduciary duty, absent further allegations of facts supporting the existence of an independent

fiduciary duty, no fiduciary duty arose and therefore no breach of such duty could arise.  *See*

*Greenberg, Trager & Herbst, LLP*, 958 N.E.2d at 84 ("[T]he purpose of [N.Y.] UCC 4-201 is

not to impose a fiduciary duty on a collecting bank."); *Tianjin Longxing (Grp.) Co. v. GMAC*

*Commercial Fin. LLC*, 2007 WL 9817703, at *3 (S.D.N.Y. Apr. 24, 2007) ("Thus, the 'trust'

which [the accountholder] put in [the collecting agent] amounts to nothing more than 'trusting'

that [the collecting agent] would perform its obligations in accordance with the terms of the

documentary collection and the Uniform Rules for Collection.  Accordingly, it simply fails to

give rise to a fiduciary relationship.").

The Court concludes that the allegations in the SAC fail to establish the existence of a

fiduciary relationship between Plaintiff and JPMorgan; therefore, Plaintiff's claim for breach of

fiduciary duty against JPMorgan is dismissed for failure to state a claim upon which relief may

be granted.

## III.    Conversion

Plaintiff next brings a claim against JPMorgan for conversion.  Dkt. No. 74 ¶¶ 62–66.

"Conversion is the 'unauthorized assumption and exercise of the right of ownership over goods

belonging to another to the exclusion of the owner's rights.'"  *Simon v. Weaver*, 327 F. Supp. 2d

258, 262 (S.D.N.Y. 2004) (quoting *Vigilant Ins. Co. of Am. v. Housing Auth. of the City of El*

*Paso*, 660 N.E.2d 1121, 1126 (N.Y. 1995)); *see also LoPresti v. Terwilliger*, 126 F.3d 34, 41 (2d

Cir. 1997).  "To plausibly allege a conversion claim, a plaintiff must show: '(1) the property

subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights.'" *Benex LC v. First Data Merch. Servs. Corp.*, 2016 WL 1069657, at *5 (E.D.N.Y. Mar. 16, 2016) (quoting *Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004); *see Kim v. Lee*, 576 F. Supp. 3d 14, 33 (S.D.N.Y. 2021), *aff'd*, 2023 WL 2317248 (2d Cir. Mar. 2, 2023). "Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Colavito v. N.Y. Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006) (internal citations omitted).

JPMorgan argues that Plaintiff's claim for conversion fails because Plaintiff has not alleged facts sufficient to establish that JPMorgan exercised control over the transaction documents in any way other than was authorized under the Collection Instructions. Dkt. No. 42 at 16–17. JPMorgan contends that it was authorized, pursuant to the Collection Instructions, to release the title documents to SportLife upon acceptance, as it did, and so Plaintiff has failed to allege facts which support a claim for conversion. *Id.* at 17–18.

There is some question whether the wrongful surrender of bills of lading, as is alleged here, can give rise to a claim in tort of conversion. In *Zhejiang Tongxiang Import & Export Corp. v. Asia Bank, N.A.,* 2001 WL 66331 (S.D.N.Y. Jan. 25, 2001), Judge Martin stated that "[t]he wrongful surrender of bills of lading, whether negligently or intentionally, constitutes conversion." *Id.* at *4 (citing *R.L. Rothstein Corp. v. Kerr S.S. Co.*, 251 N.Y.S.2d 81, 86 (1st Dep't 1964) ("By issuing the bill of lading which stands instead of the goods, and thereby conferring a right of the possession to the goods on another, defendant . . . effectively converted

the tallow in derogation of plaintiff['s] possessory security interest.").  In that case, the defendant collecting bank was alleged to have transferred the title documents to the freight forwarder prior to receiving payment, even though the collection instructions stated that the bank was only to release the documents after receiving payment.  *Id.* at *1–2.  In *Neewra, Inc. v. Manakh Al Khaleej Gen. Trading & Contracting Co.*, 2004 WL 1620874 (S.D.N.Y. Jul. 20, 2004), where the question was squarely presented whether the mishandling of documents in violation of collection instructions sounded in tort or in contract, Judge Mukasey expressed skepticism about the statement in *Asia Bank* and stated that he was "hard-pressed to discern how [defendant's] mishandling of the collection . . . could give rise to a tort claim instead of a breach of contract claim," but cited *Asia Bank* in holding that "releasing [plaintiff's] documents . . . without obtaining the requisite payment—could be considered a 'tortious act without the state.'"  *Id.* at *6 (quoting N.Y. C.P.L.R. § 302(a)(3)).  The court assumed without deciding that the mishandling of documents was cognizable in tort but then rejected the claim that such conduct outside the state gave rise to personal jurisdiction in the state.  *Id.* at *6–7.

The Court too is skeptical that JPMorgan's alleged mishandling of the documents by turning them over to the importer in violation of the Collection Instructions could give rise to a separate claim in tort.  Courts interpreting New York law have held that "a cause of action alleging conversion cannot be predicated upon a mere breach of contract," and that the contracting party must also allege "a breach of duty distinct from, or independent of, the breach of contract."  *Conn. N.Y. Lighting Co. v. Manos Bus. Mgmt. Co.*, 98 N.Y.S.3d 101, 103 (2d Dep't 2019); *see also Alishaev Bros. Inc. v. LA Girl Jewelry Inc.*, 2020 WL 1489841, at *13 (S.D.N.Y. Mar. 27, 2020) ("A claim for conversion will not lie under New York law where it merely restates or where it is predicated on a 'mere breach of contract.'" (quoting *MBL Life Assurance*

*Corp. v. 555 Realty Co.*, 658 N.Y.S.2d 122, 124 (2d Dep't 1997)); *W.B. David & Co., Inc. v. DWA Commc'ns, Inc.*, 2004 WL 369147, at *5 (S.D.N.Y. Feb. 26, 2004) ("[A] claim for conversion is deemed redundant, and may be dismissed pursuant to Rule 12(b)(6), where damages are merely being sought for a breach of contract."); *Dervin Corp. v. Banco Bilbao Vizcaya Argentaria, S.A.*, 2004 WL 1933621, at *6 (S.D.N.Y. Aug. 30, 2004) ("[P]laintiff's conversion claim, predicated on defendant's allegedly wrongful seizure and possession of the accrued interest is merely duplicative of defendant's contract claim."); *Rolls-Royce Motor Cars, Inc. v. Schudroff*, 929 F. Supp. 117, 124 (S.D.N.Y. 1996) ("In identifying the dealer agreement as the source of its allegedly superior right of possession, plaintiff tacitly admits that it is seeking to enforce a contract right, not a right tied to some independent duty under state law. The appropriate remedy for a contracting party's failure to honor its obligations under a contract is an action for breach of contract.").  There is no apparent reason why the rule should be different when the question is whether a collecting bank followed its collection instructions than it is when, for example, plaintiff is challenging defendant's foreclosure of a mortgage upon real property, *MBL Life Assurance Corp.*, 658 N.Y.S.2d at 123–24, or where plaintiff alleges that it paid for agreed upon marketing services that were never delivered, *W.B. David & Co.*, 2004 WL 369147, at *1, or where a car manufacturer alleges a car dealership committed conversion by transferring cars to a third-party, *Rolls-Royce*, 929 F. Supp. at 120.  As a general matter, parties are permitted to define their obligations to one another *ex ante* by agreement; when they have done so, courts should be loathe to impose any extracontractual obligations on them *ex post*. *See, e.g.*, *Hargrave*, 636 F.2d at 898–99 ("A plaintiff may recover in contract because the defendant has made an agreement, and the law thinks it desirable to be held to that agreement. Tort liability is imposed on the basis of some social policy that disapproves the infliction of a

specific kind of harm irrespective of any agreement.").

Plaintiff's allegations therefore are without merit for two independent reasons.  First, the claim sounds entirely in contract and not in tort; Plaintiff has not alleged any duties independent of the breach of contract, and Plaintiff has not alleged a breach of contract.  *Conn. N.Y. Lighting Co.*, 98 N.Y.S.3d at 103.

Second, even assuming that the conversion claim can lie alongside the breach of contract claim, Plaintiff has not alleged any facts establishing that a conversion occurred.  A conversion claim lies only when the defendant "exercise[s] an *unauthorized* dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights."  *Benex LC*, 2016 WL 1069657, at *5 (emphasis added) (internal citation omitted); *see also Simon,* 327 F. Supp. 2d at 262.  Where the defendant's exercise of dominion is authorized, when it follows the plaintiff's instructions, no claim of conversion can lie.  *See, e.g.*, *Dynamic Worldwide Logistics, Inc. v. Exclusive Expressions, LLC*, 77 F. Supp. 3d 364, 371 (S.D.N.Y. 2015) ("According to the Complaint, [plaintiff's] employee authorized the transfer of cargo . . . .  Therefore, the Complaint fails to adequately plead a claim for conversion."); *see also Nat'l Steamship Co. v. Sheahan*, 25 N.E. 858 (N.Y. 1890) (affirming dismissal of action for replevin of allegedly converted steamship tickets "because the defendant neither unlawfully obtained possession of the tickets nor wrongfully disposed of them").  A party temporarily entrusted with property can follow its owner's instructions to deliver that property to a third party without assuming liability in tort. *See Dynamic Worldwide Logistics*, 77 F. Supp. 3d at 371 ("Second, when possession of the property by a defendant was initially lawful, an action for conversion only arises if plaintiff made demands for return of the property or a defendant wrongfully transferred or dispossessed of it.").  But that is all that JPMorgan is alleged to have done.  It was instructed to deliver the documents

to Specsavers (and SportLife) upon the acceptance by SportLife of the RMG and SportLife's assumption of the obligation to pay for the RMG. The SAC states that "[p]ursuant to the agreements" the goods were released "upon acceptance." Dkt. No. 74 ¶ 15. JPMorgan's exercise of dominion over the title to the goods was authorized by the Collection Instructions, and could not give rise to a claim for conversion.

Analogizing to *Hatzlachh Supply Co. v. Bank of Am., N.Y.*, 616 N.E.2d 847 (N.Y. 1993), Plaintiff argues that JPMorgan committed conversion by failing to "obtain a guarantee before transferring title." Dkt. No. 53 at 24. The court in that case noted that "plaintiff delivered to defendant a collection order for the goods which authorized release of documents of title only upon payment . . . or upon receipt of a guarantee of payment," but that defendant delivered "a modified collection order allowing for delivery of documents of title without payment or a guarantee of payment." *Hatzlachh*, 616 N.E.2d at 847–48. The court therefore held that plaintiff was entitled to summary judgment because "defendant improperly allowed release of the title to the purchased goods." *Id.* at 847.

*Hatzlachh*, however, fails to support a claim for conversion in this case for two reasons. First, the action in *Hatzlachh* was for breach of the collection order, and not for the tort of conversion. *Id.* Second, the collection orders in *Hatzlachh* permitted the bank to release the documents of title only upon receipt of payment or upon a guarantee of payment by a third-party bank and the defendant, in violation of those orders, delivered the documents without payment and without a guarantee. *Id.* Here, JPMorgan was not under obligation to obtain payment or a guarantee of payment from a third party before releasing title to the documents and it delivered the documents as instructed in the Collection Instructions.

The Court concludes that the allegations in the SAC fail to establish a separate duty binding JPMorgan that could give rise to a conversion claim alongside a claim for breach of contract, and also fail to establish that JPMorgan exercised dominion over the title documents in an unauthorized manner; therefore, Plaintiff's claim for conversion against JPMorgan is dismissed for failure to state a claim upon which relief may be granted.

## IV.   Negligence

Plaintiff's fourth count is for negligence.  "The elements of a negligence claim under New York law are: '(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach.'"  *Pasternack v. Lab. Corp. of Am. Holds.*, 807 F.3d 14, 19 (2d Cir. 2002) (quoting *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002)).  "Whether a defendant owes a duty of care to a plaintiff 'is a question of law that the Court may properly determine on a motion to dismiss.'"  *Qube Films Ltd. v. Padell*, 2014 WL 3952931, at *7 (S.D.N.Y. Aug. 12, 2014) (quoting *Musalli Factory For Gold & Jewellry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 27 (S.D.N.Y. 2009), *aff'd* 382 F. App'x 107 (2d Cir. 2010).  For example, "[p]rofessionals, such as lawyers and engineers, by virtue of their training and expertise, may have special relationships of confidence and trust with their clients." *Kimmel v. Schaefer*, 675 N.E.2d 450, 454 (N.Y. 1996).

Plaintiff alleges that JPMorgan "owed Generation Next a duty of ordinary care under UCC New York and reasonable care under URC § 522, in collecting the payment owed to Generation Next, advising of non-payment without delay, and endeavoring to ascertain reasons for non-payment."  Dkt. No. 74 ¶ 68.  Plaintiff alleges that JPMorgan "breached such duties of reasonable and/or ordinary care."  *Id.* ¶ 69.  JP Morgan does not dispute that it "owed Plaintiff a duty to handle the collection in good faith, with reasonable care, and in accordance with the Collection Instructions."  Dkt. No. 42 at 18.  JPMorgan argues, however, that the negligence

claim should be dismissed because the SAC "shows that JPMorgan performed its obligations in accordance with the URC and the Collection Instructions regarding payment by SportLife and that Plaintiff was not damaged by any alleged failure of JPMorgan to perform." *Id.* JPMorgan also argues that even if it did breach a duty of care owed to Defendant, such breach could not be found to be the proximate cause of Plaintiff's injury. *Id.* at 18–19.

As stated in Sections II and III, the SAC fails to allege facts that establish JPMorgan owed Plaintiff a duty independent of its contractual obligations. *See, e.g.*, *Deutsche Bank Sec., Inc. v. Rhodes*, 578 F. Supp. 2d 652, 670 (S.D.N.Y. 2008) ("The New York Court of Appeals has never found financial institutions . . . to be professionals for these purposes, and defendants do not cite to any New York decisions holding [otherwise] . . . On the contrary, courts have found that in actions involving the contractual duties of corporations and financial institutions, a negligence action may not be maintained and parties must proceed under a contract theory."); *see also Abhyankar by Behrstock v. JPMorgan Chase, N.A.*, 2020 WL 4001661, at *5 (S.D.N.Y. July 15, 2020) ("Typically, under New York law, a bank does not have an extracontractual duty to its depositors."); *Freyberg*, 171 F. Supp. 3d at 191 ("[T]he relationship between a bank and its depositor is that of debtor and creditor, which, without more, is not a fiduciary or special relationship." (internal citation and quotation marks omitted)). Even if the Court were to find that it did, however, Plaintiff has not pleaded facts alleging that JPMorgan violated that duty. The Collection Instructions directed JPMorgan to release the title documents upon acceptance, which it did. Dkt. No. 41-4–41-5. The Collection Instructions did not require JPMorgan to obtain payment or a guarantee of payment before releasing the title documents and they did not require JPMorgan to advise regarding non-payment. Plaintiff therefore does not plead facts establishing that JPMorgan violated any of its obligations.

The allegations in the SAC fail to establish a separate duty binding JPMorgan that could give rise to a negligence claim alongside a claim for breach of contract, and alternatively that JPMorgan breached any duty it might have owed; therefore, Plaintiff's claim for negligence against JPMorgan is dismissed for failure to state a claim upon which relief may be granted.

## V.    Tortious Interference with Contract

Plaintiff next brings two claims against JPMorgan for tortious interference with contract. Under New York law, tortious interference with contract requires several elements: the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of said contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting from the breach. *See Lama Holding Co. v. Smith Barney*, 668 N.E.2d 1370, 1375–76 (N.Y. 1996); *see also Italverde Trading, Inc. v. Four Bills of Lading Numbered LRNNN 120950, LRNNN 122950, LRNN 123580, MSLNV 254064*, 485 F. Supp. 2d 187, 202 (E.D.N.Y. 2007) (noting that a demonstration of the breach, rather than mere interference, of the third-party contract is necessary to sustain a tortious interference with contract claim under New York law). "It is imperative that, in bringing a tortious interference claim, a plaintiff identify the relevant terms of the contract that existed that were breached by defendant." *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 791 (S.D.N.Y. 2019) (internal quotation marks omitted). Further, the plaintiff must plead "specific allegations of the defendant's knowledge of the contract, including some knowledge of the terms and conditions of the allegedly-interfered-with contract." *Taboola, Inc. v. Ezoic Inc.*, 2020 WL 1900496, at *10 (S.D.N.Y. Apr. 17, 2020) (internal citation and quotation marks omitted). "Moreover, 'a plaintiff must allege that the contract would not have been breached "but for" the defendant's conduct.'" *Rich v. Fox News Network, LLC*, 939 F.3d 112, 127 (2d Cir. 2019) (quoting *Burrowes v. Combs*, 808 N.Y.S.2d 50,

53 (1st Dep't 2006)).

Plaintiff's first claim of tortious interference with contract alleges that "[i]n transferring title documents to defendant SportLife without receipt of payment, defendant JPM sought to prevent the performance of the contract in the manner contemplated by the parties so as to withhold the benefits of the contract from Generation Next, in favor of providing defendant SportLife with enhanced benefits under its contract with Generation Next." Dkt. No. 74 ¶ 74.

Plaintiff's first claim of tortious interference with contract fails to state a claim upon which relief may be granted.[9]   First, as the Court has stated, JPMorgan's transfer of title documents to Plaintiff was governed by a contractual relationship between the parties, and does not give rise to a tort claim.  *See Choquette v. Motor Info. Sys., Inc.*, 2017 WL 3309730, at *6

---

[9] In its briefing on the motion to dismiss, Plaintiff stated that although this count "is denoted as 'tortious interference,' it actually was intended to be labeled, 'breach of good faith and fair dealing,' which is the claim stated therein." Dkt. No. 53 at 26.  After submitting its briefing on the motion to dismiss, Plaintiff filed its SAC.  Dkt. No. 74.  In the SAC, Plaintiff again labeled the claim as one for tortious interference with contract.  *Id.* ¶¶ 70–76.  The Court therefore treats the claim as one for tortious interference with contract.
Even if the claim were to proceed as a claim for breach of covenant of good faith and fair dealing, Plaintiff does not state a claim upon which relief may be granted.  "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *see Marcus v. W2007 Grace Acquisition I, Inc.*, 203 F. Supp. 3d 332, 340 (S.D.N.Y. 2016) ("Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract.") (quoting *Harris*, 310 F.3d at 80).  Thus, "[a] claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243–44 (S.D.N.Y. 1997) (internal quotation marks omitted); *see Ret. Bd. of Policemen's Annuity & Benefit Fund of City of Chi. v. Bank of N.Y. Mellon*, 2014 WL 3858469, at *3 (S.D.N.Y. July 30, 2014) ("[C]ourts confronted with [breach of contract] complaints under New York law regularly dismiss any freestanding claim for breach of the covenant of fair dealing where the claims derive from the same set of facts.") (internal quotation marks omitted); *Mancuso v. L'Oreal USA, Inc.*, 2021 WL 1240328, at *5 (S.D.N.Y. Apr. 2, 2021) (same).  The alleged conduct giving rise to the claim is the same conduct giving rise to Plaintiff's breach of contract claim.  The claim is therefore duplicative and must be dismissed.

(S.D.N.Y. Aug. 2, 2017) ("As a general rule, tortious interference claims that are duplicative of contract claims are precluded."); *see also Maricultura Del Norte, S. de R.L. de C.V. v. Umami Sustainable Seafood, Inc.*, 769 F. App'x 44, 55 (2d Cir. 2019) (affirming dismissal of tortious interference with contract claim where claim was based upon same conduct as breach of contract claim). "That rule 'logically applies where a plaintiff seeks to assert a tortious-interference claim against the same party that has allegedly breached its contract, and where the plaintiff's tort allegations are based on the same conduct as that which gave rise to the alleged contract breach.'" *Lavazza Premium Coffees Corp. v. Prime Line Distributors Inc.*, 575 F. Supp. 3d 445, 471 (S.D.N.Y. 2021) (quoting *Wiederman v. Spark Energy, Inc.*, 2020 WL 3965258, at *10 (S.D.N.Y. Mar. 9, 2020), *report and recommendation adopted*, 2020 WL 1862319 (S.D.N.Y. Apr. 14, 2020)) (alteration omitted). The rule is inapplicable where "plaintiffs show that their tort claim is based on a duty that springs from circumstances extraneous to and not constituting elements of, the parties' contract." *Horowitz v. Nat'l Gas & Elec., LLC*, 2018 WL 4572244, at *7 (S.D.N.Y. Sept. 24, 2018) (internal alterations and quotation marks omitted). However, JPMorgan's only duties with respect to the transfer of title documents are those that arose pursuant to the contractual agreement between it and Plaintiff. That transfer thus cannot give rise to a claim of tortious interference with contract.

Plaintiff's second claim of tortious interference with contract alleges that JPMorgan "intentionally, knowingly, recklessly, and/or negligently interfered with the plaintiff's economic relations by falsely claiming SportLife's entitlement to certain credits and/or offsets pursuant to the Fraudulent Agreement." Dkt. No. 74 at ¶ 98. According to Plaintiff, JPMorgan wrongly made "claims, without limitation, on January 17, 2021 and May 24, 2021, via SWIFT messages which allegedly attached the subject Fraudulent Agreement but which did not do so, in an effort

to justify non-payment by SportLife, and otherwise for the purpose of interfering with the plaintiff's economic and contractual relations both with SportLife and with third parties."  *Id.* ¶ 99.  JPMorgan responds that Plaintiff's allegations fatally undermine its own assertion that JPMorgan induced SportLife's breach of contract because the allegations of the SAC make clear that SportLife's alleged breach occurred before JPMorgan's actions that Plaintiff claims give rise to a claim of tortious interference against it.  *Id.* at 21.

Plaintiff again fails to state a claim upon which relief can be granted.  Plaintiff alleges that it entered into the "fraudulent agreement" with SportLife, containing modified terms, on December 29, 2020.  *Id.* ¶ 92.  Plaintiff's claim of tortious interference with contract against JPMorgan is, however, based on SWIFT messages that JPMorgan sent to it on January 17, 2021 and May 24, 2021.  *Id.* ¶ 99.  Plaintiff does not plead any facts that would indicate that SportLife would have paid for the RMG but for JPMorgan's SWIFT messages on January 17, 2021 and May 24, 2021.  *See, e.g.*, *Rich*, 939 F.3d at 127 ("If the breach would have occurred . . . apart from [defendant's] actions, then of course there would be no but-for causation."); *see also KAM Constr. Corp. v. Bergey,* 56 N.Y.S.3d 740, 742 (4th Dep't 2017) (granting summary judgment to defendant where third party's decision to breach was made prior to any involvement by defendant).  Plaintiff therefore fails to state a claim for tortious interference with contract upon which relief may be granted.

## VI.  Bailment

JPMorgan next moves to dismiss Plaintiff's claim for bailment.  Dkt. No. 42 at 21–22. "Under New York law, a bailment is defined as 'a delivery of personal property for some particular purpose . . . upon a contract express or implied, and that after such purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions or kept until he reclaims it, as the case may be.'"  *Ancile Inv. Co. v. Archer Daniels*

*Midland Co.*, 784 F. Supp. 2d 296, 306 (S.D.N.Y. 2011) (quoting *Herrington v. Verrilli*, 151 F. Supp. 2d 449, 457 (S.D.N.Y. 2001)).

Plaintiff argues that JPMorgan "held the title documents, and thus maintained control of Generation Next's personalty, and was only authorized to release the same after obtaining a written undertaking from SportLife." Dkt. No. 53 at 29. According to Plaintiff, because "the title documents were released without a written undertaking from SportLife . . . [JPMorgan] caused Generation Next to lose its property, both physically and by way of title." *Id.* at 29–30. JPMorgan responds that Plaintiff's bailment claim should be dismissed for the same reasons that it argues Plaintiff's conversion claim should be dismissed: "JPMorgan received and then delivered the title documents to SportLife in accordance with the terms of the Collection Instructions given to JPMorgan." Dkt. No. 42 at 22. According to JPMorgan, "the documents were to be released against 'acceptance,' not against payment, and nothing in SEBL's instructions or their supposed amendment required a 'guarantee.'" Dkt. No. 54 at 9.

As with Plaintiff's other tort claims, a claim for bailment arising from the same conduct as a breach of contract claim is duplicative of the breach of contract claim. *See, e.g.*, *Pandisc Music Corp. v. Red Distribution, LLC*, 2005 WL 646216, at *1 (S.D.N.Y. Mar. 18, 2005) (dismissing bailment claim as duplicative of breach of contract claim because, "according to the allegations of plaintiffs' complaint, defendant's possession of plaintiffs' property was governed not by the independent duties owed by one citizen to another under general tort principles, but by a specific agreement negotiated between the parties," and "[t]hus, whether defendant violated any duty to plaintiffs is governed by the contract, and the remedy for any such violation is an action for breach of that contract"). Plaintiff does not plead facts that would give rise to a separate duty independent of the contract itself.

Plaintiff's claim for bailment against JPMorgan is dismissed for failure to state a claim upon which relief may be granted.

## VII.   Fraud

Plaintiff brings a claim against JPMorgan for fraud.  To state a claim for fraud under New York law, a plaintiff must allege "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Budhani v. Monster Energy Co.*, 527 F. Supp. 3d 667, 687 (S.D.N.Y. 2021) (quoting *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001)).

"It is well settled under New York law that 'a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations.'"  *Int'l CableTel Inc. v. Le Groupe Videotron Ltee*, 978 F. Supp. 483, 487 (S.D.N.Y. 1997) (Sotomayor, *J.*) (quoting *Rocanova v. Equitable Life Assurance Soc'y of the U.S.*, 634 N.E.2d 940, 944(N.Y. 1994)).  Although "a promise [that] was made with a preconceived and undisclosed intention of not performing it . . . constitutes a misrepresentation of a material existing fact," *id.* (internal quotation marks omitted), "where a fraud claim 'is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie,'" *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (quoting *McKernin v. Fanny Farmer Candy Shops, Inc.*, 574 N.Y.S.2d 58, 59 (2d Dep't 1991)); *see also New York Univ.*, 662 N.E.2d at 767 ("[W]here a party is merely seeking to enforce its bargain, a tort claim will not lie.").  "[A] simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated."  *Clark-Fitzpatrick*, 516 N.E.2d at 193 (internal citation omitted).  Thus, "[t]o

maintain a claim of fraud in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages."

*Bridgestone/Firestone, Inc.*, 98 F.3d at 20 (internal citations omitted); *see also Int'l CableTel*, 978 F. Supp. at 487.

Plaintiff's fraud claim is based upon what Plaintiff terms the "Fraudulent Agreement." Dkt. No. 74 ¶¶ 102–104. Plaintiff claims that in a SWIFT message on January 17, 2020, JPMorgan stated that according to an "enclosed signed agreement between SportLife and Specsavers, the agent of Generation Next" the amount due had been discounted with a new maturity date. *Id.* ¶ 37. Plaintiff alleges that the message was knowingly false since Specsavers was known to be the agent of SportLife, and not Generation Next, and since there was no written agreement signed by Plaintiff giving a further discount. *Id.* ¶ 38. JPMorgan argues that the fraud claim should be dismissed for failure to plead fraud with particularity or to plead that the alleged fraud cause Plaintiff injury. Dkt. No. 42 at 22–24.

As a preliminary matter, to the extent that Plaintiff would plead a claim in fraud for JPMorgan's delivery of the documents, such a claim would be without merit. Courts in this district have held that with regard to collecting banks, claims for fraud cannot lie alongside claims for breach of contract:

> [U]nder New York law a fraud claim cannot be premised solely on the same facts as Plaintiff's breach of contract. Although [plaintiff] and [collecting bank] were not parties to a contract, they were parties to a documentary collection agreement, and the Court finds that the rationale underlying this rule is applicable to the case at bar . . . . The documentary collection at issue was subject to the Uniform Rules of Collection, which imposed certain obligations on [remitting bank] as the collecting/remitting bank. Under Article 26 of the U.R.C., GMAC had to "endeavour to ascertain the reason for [Trade-Am's] non-payment and "send

> without delay advice of nonpayment" to the Bank of China.  GMAC's failure to communicate to the Bank of China Trade-Am's non-payment of the sight draft, and its subsequent failure to respond to inquiries from the Bank of China, may constitute violations of the Uniform Rules for Collection, but the actions do not give rise to an independent claim for fraudulent concealment.

*Tianjin Longxing (Grp.) Co.*, 2007 WL 9817703, at *4 (quoting URC Art. 26(c)(3)) (internal citation omitted).  Although the court in that case was confronted with a claim for fraudulent concealment, the same principles apply to Plaintiff's claim for fraud in the instant case, and bar pursuit of a claim for fraud alongside a claim for breach of contract.

Plaintiff cannot establish a claim of fraud based on JPMorgan's subsequent communications.  Although Plaintiff alleges in conclusory form that it "and/or its banking agent or agents in Bangladesh" relies on the "Fraudulent Agreement," causing "damage to the plaintiff by harming its credit facilities, and otherwise," Dkt. No. 74 ¶¶ 103–104, it fails to allege facts supporting that any conduct of JPMorgan could have caused it injury.  Taking the allegations of the SAC as true, by the time of the January 17, 2021 SWIFT message, SportLife was already months late in its payment for RMG.  The SAC alleges that SERL issued its first payment demand on October 21, 2020, and that such payment demand was not honored.  *Id.* ¶ 27.  In November 2020, SportLife acknowledged it was late in its payment.  *Id.* ¶ 35.  And, by December 29, 2020—before the date of the SWIFT message—Plaintiff had already agreed to the discount sought by SportLife.  *Id.* ¶ 36.  Plaintiff would have known that Specsavers was not its agent (one of the two alleged misrepresentations) and would have known whether it signed a "written agreement . . . giving a further discount to SportLife." *Id.* ¶ 38 (the second of the two alleged misrepresentations).  There is no allegation that the SWIFT message caused Plaintiff to desist from demanding payment on the terms it had previously agreed to following receipt of the message.  In March 2021 and in June 2021, Plaintiff had its bank agent send additional payment demands.  *Id.* ¶¶ 43, 45.  Nor is there any allegation that the SWIFT message caused SportLife

not to pay on the agreed terms—SportLife failed to pay both before and after the January 2021 SWIFT message.  Plaintiff therefore has failed to plead facts establishing that it suffered any injury from the fact that the SWIFT message described Specsavers as its agent (and not SportLife's) or represented that it enclosed an agreement which was not enclosed.[10]

Accordingly, Plaintiff's claim for fraud against JPMorgan is dismissed for failure to state a claim upon which relief may be granted.

## VIII.   Civil Conspiracy

Finally, JPMorgan moves to dismiss Plaintiff's claim for civil conspiracy.  In order to establish a claim of civil conspiracy under New York law, a "plaintiff must demonstrate the underlying tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury."  *Fisk v. Letterman*, 424 F. Supp. 2d 670, 677 (S.D.N.Y. 2006).  "New York does not recognize civil conspiracy as an independent cause of action."  *Reich v. Lopez,* 38 F. Supp. 3d 436, 460 (S.D.N.Y. 2014).

---

[10] JPMorgan also argues that the fraud claim should be dismissed for failure to plead fraud with particularity.  The SAC states that "Defendants knew that the Fraudulent Agreement was, in fact, false and fraudulent but was stated to be legitimate with the intent of inducing the plaintiff and/or its lending agents to rely thereupon to the plaintiff's detriment." Dkt. No. 74 ¶ 103.  JPMorgan argues that the claim violates Rule 9(b) because it does not identify JPMorgan as one of the Defendants to whom Plaintiff is referring. Dkt. No. 42 at 22-23.  Claims for common law fraud under New York law must satisfy the heightened pleading requirements of Rule 9(b) and be pleaded "with particularity." Fed. R. Civ. P. (9)(b); *see also B & M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 481 (S.D.N.Y. 2010).  The plaintiff "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).  Although JPMorgan argues that the SAC is defective for failure to identify JPMorgan, the SAC identifies JPMorgan as at least one of the Defendants to whom Plaintiff is referring. Dkt. No. 74 at ¶ 37.  JPMorgan does not make any other argument under Rule 9(b) and therefore the Court has no occasion to address whether the SAC is deficient in other ways under Rule 9(b).

"Allegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort."  *Alexander & Alexander of New York, Inc. v. Fritzen*, 503 N.E.2d 102, 102 (N.Y. 1986).

Plaintiff argues that its conspiracy claim should be sustained because it "has plausibly alleged claims of tortious interference, conversion, and fraud."  Dkt. No. 53 at 31.  Plaintiff alleges that JPMorgan "conspired to commit such torts" with the other defendants in this action. JPMorgan argues that the alleged torts are insufficiently pleaded, and that there is therefore not an underlying tort that could give rise to a claim of civil conspiracy.  Dkt. No. 42 at 25. JPMorgan also argues that, even if Plaintiff did adequately plead an independent tort, that it has offered only conclusory allegations as to any conspiracy between co-defendants to commit such torts.  *Id.*

Because the Court has dismissed each of Plaintiff's tort claims, Plaintiff does not state a claim for civil conspiracy.  Therefore, Plaintiff's claim for civil conspiracy is also dismissed.

## CONCLUSION

JPMorgan's motion to dismiss all of Plaintiff's claims against it is GRANTED with prejudice.[11]

SO ORDERED.

Dated: October 16, 2023
      New York, New York

                                        LEWIS J. LIMAN
                                  United States District Judge

---

[11] Plaintiff has already amended its complaint twice and does not assert that there are any facts it possesses which would cure the defects the Court has identified in the SAC.  *See Wolet Capital Corp. v. Walmart Inc.*, 2021 WL 2383213, at *1 (S.D.N.Y. Jun. 10, 2021) (granting motion to dismiss with prejudice because plaintiff "has had numerous opportunities to amend, and any further amendment would be futile"); *see also McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) ("[I]t is within the sound discretion of the district court to grant or deny leave to amend. A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." (internal citations omitted)); *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (finding that repleading would be futile when the "problem with [the pleader's] causes of action is substantive").